# Exhibit A

C. Moze Cowper
Cowper Law LLP
12301 Wilshire Blvd.
STE 303
Los Angeles, CA 90025
(877) 259-3707
mcowper@cowperlaw.com

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF KERN
METROPOLITAN COURTHOUSE

Ethan Rodriguez,
                    Plaintiff,

            vs.

Microsoft Corporation, Mojang Studios,
and Epic Games, Inc. and JOHN DOES 1 -
50,

            Defendants.

No.

COMPLAINT FOR DAMAGES

1. Strict Product Liability – Design Defect
2. Strict Product Liability – Failure to Warn
3. Negligence – Design
4. Negligence – Failure to Warn
5. Common Law Negligence
6. Statutory Negligence
7. Intentional Misrepresentation
8. Negligent Misrepresentation
9. Fraud
10. Violations of California's Unfair
    Competition Law (Cal. Bus. & Prof. Code, §§
    17200 *et seq.*)

DEMAND FOR JURY TRIAL

## **COMPLAINT**

Plaintiff Ethan Rodriguez hereby brings this action against the above-captioned Defendants

(hereinafter collectively referred to as "Defendants"), Epic Games, Inc., Microsoft Corporation,

Mojang Studios, and DOES 1-50 to recover damages arising from the severe injuries sustained

because of Plaintiff's use of Defendant's video game products. In support thereof, Plaintiff alleges and states:

### **INTRODUCTION**

1.      Many modern video games are fun and engaging adventures that allow players to immerse themselves in the gameplay and the world of the game. However, in addition to these endlessly creative and fun games, there are some video games that pose serious risks to players. This litigation seeks to hold each Defendant accountable for failing to warn and failing to include available safeguards against the known risks associated with excessive use of their video games products and choosing instead to implement programming that both caused and amplified these risks in order to increase Defendants' profits.

2.      Defendants are aware that the more time a player spends on their respective game or platform, the more likely it is that said player will make in-game purchases, thereby increasing Defendants' revenues.

3.      Defendants are also aware that for more than four decades, scientists have known about and have studied video game addiction.[1] Furthermore, Defendants are aware that for nearly two decades, science has shown that prolonged use of video games can result in brain damage, cognitive decline, and physical and emotional deficits. These issues are magnified if the player is a minor.

4.      Despite being fully aware of these risks, Defendants marketed their respective games Fortnite and Minecraft without implementing simple safety features, such as adequate parental controls, warning, or opt-in limits on the time players can spend in game.

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

5.      Instead, in order to maximize time spent in their respective games and platforms, Defendants chose to add features to their Products knowing they would be addictive to minors, thus improving the odds of players making in-game purchases, and thereby increasing Defendants' profits. Rather than taking necessary steps to mitigate the known risks associated with prolonged exposure to video games, Defendants intensified the problem by causing and profiting from addiction in minors and young adults.

6.      Defendants' strategies have been extremely lucrative. As a result of Defendants' inclusion of addictive features in their respective Products, they have collectively generated billions of dollars, while causing and/or contributing to a public health crisis of minors and young adults suffering from addiction to and disordered use of video games.

7.      While there are countless video games on the market, many with similar game design and warning defects described herein, Defendants and their respective games have unique impacts on players. These games and platforms are designed with features meant to draw minors and young adults in and keep them coming back to the games in an addictive cycle.

8.      Defendant Microsoft's Xbox video game platform is where Plaintiff played the other Defendants' games. As described herein, Defendant Microsoft designed its Xbox platform with gamified features that caused and further exacerbated addiction and disordered relationships with video games.

9.      As set forth below, Defendants' marketing efforts and game design resulted in Plaintiff investing thousands of hours and dollars into their Products. As each Defendant expected and intended from their decision to add addictive and manipulative programming to their Products instead of safety features, Plaintiff became addicted to Defendants' Products and developed a disordered relationship with video games. As a result, Plaintiff suffers from mental, physical, and

COMPLAINT FOR DAMANGES AND DEMAND FOR JURY TRIAL

economic injuries, including diminished social interactions, lack of interest in other hobbies, withdrawal symptoms such as rage, anger, and physical outbursts. Through this lawsuit, Plaintiff seeks to hold Defendants accountable for their decision to place profits over safety, which directly and proximately resulted in Plaintiff's harm.

## PARTIES

### I.    Plaintiff Ethan Rodriguez

10.    Plaintiff, Ethan Rodriguez, is, and at all times relevant to this action a citizen and resident of the State of California whose principal place of residence is Ridgecrest, CA.

11.    Plaintiff began playing Defendants' Products at approximately 12 years old. Since that time, Plaintiff has used and/or continues to use Defendants' Products at an increasing, uncontrollable, compulsive, and/or addictive pace. Plaintiff has been injured and damaged and continues to be injured and damaged, as a result of Plaintiff's use of Defendants' Products.

### II.    Defendant Epic Games

12.    Defendant Epic Games, Inc. ("Epic Games") is a Maryland Corporation with is principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

13.    Epic Games is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform either directly or indirectly, to members of the general public within the State of California, including to Plaintiff.

### V. Defendant Microsoft Corporation

14.    Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

15.    Microsoft is video game developer and publisher that, at all times hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public within the State of California, including Plaintiff.

16.    At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox platform – on which the other Defendants' Products could be played – to members of the general public within the State of California.

**VI. Defendant Mojang**

17.    Defendant Mojang AB ("Mojang") is a Swedish company with its principal place of business at Söder Mälarstrand 43, 118 25 Stockholm, Sweden.

18.    Mojang is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public within the State of STATE, including to Plaintiff.

19.    In September 2014, Defendant Microsoft acquired Defendant Mojang and its intellectual property (including Minecraft) for $2.5 billion. Accordingly, Defendant Mojang is now a wholly owned subsidiary of Defendant Microsoft.

20.    Although Mojang initially developed, sold, and maintained Minecraft, following its acquisition by Microsoft, both Microsoft and Mojang have played direct roles in changes made to the design, development, testing assembly, manufacture, publishing, packaging, labeling,

preparation, distribution, marketing, supply and/or sale of the Minecraft video game series that Plaintiff began playing. Indeed, both Mojang and Microsoft are responsible for the addictive design features in Minecraft described herein. Both Mojang and Microsoft have direct liability for the harm and injuries caused by Minecraft based on their own conduct.

## JURISDICTION AND VENUE

21.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

22.    This suit alleges of action seeking relief arising under the laws of the State of California, including but not limited to allegation that as a direct and proximate result of Defendants' Products and Defendants' negligent, deceptive, willful, immoral, reckless, and unlawful actions and inactions, representations and misrepresentations, including by omission, Plaintiff suffered and continues to suffer injuries and damages within the State of California.

23.    This Court has personal jurisdiction over Defendant Epic Games, Microsoft, and Mojang because Defendants routinely conduct business in California and have sufficient minimum contacts in California, stemming from their activities whereby they have purposefully and intentionally availed themselves of this jurisdiction and the benefits and protections of the laws of the State of California by marketing video game Products and transacting business in the States of California. Additionally both Epic Games and Microsoft have a registered agents for service of process in California. Epic Games' registered agent is CT Corporation System, 330 N Brand Blvd, Glendale, California 91203. Microsoft's registered agent is 1505 Corporation, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, CA 95833.

24.    Venue is proper in this County because a substantial part of the events giving rise to the claim occurred in this County where the Plaintiff resides.

COMPLAINT FOR DAMANGES AND DEMAND FOR JURY TRIAL

**GENERAL FACTUAL ALLEGATIONS**

25.     In 2023, 65% of Americans of all ages played video games every week.[2] In 2024, experts reported that roughly 85% of teenagers say they play video games, with 97% of boys and 73% of girls reporting video game usage.[3] Further, more than 90% of children older than two years old play video games, and "[c]hildren 8 to 17 years of age spend an average of 1.5 to 2 hours daily playing video games."[4] This research dramatically emphasizes the idea that video game usage has become fundamental in the life of an American child.

**I.      Extensive Video Game Damages Adolescent Brains**

26.     For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of Internet Gaming Disorder ("IGD"), which is the addiction to video gaming.

27.     Research on the impacts of video game usage includes studies about the role dopamine plays in the brain during gameplay.

28.     Video games can and do cause an intense dopamine release in the user similar in magnitude to that experience by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-

---

[2] Crosby Armstrong, *Video Games Remain America's Favorite Pastime With More Than 212 Million Americans Playing Regularly*, Ent. Software Ass'n (Jul. 10, 2023), https://www.theesa.com/video-games-remain-americas-favorite-pastime-with-more-than-212-million-americans-playing-regularly/.
[3] Jeffrey Gottfried & Olivia Sidoti, *Teens and Video Games Today*, Pew Res. (May 9, 2024), https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/.
[4] Daniel Alanko, *The Health Effects of Video Games in Children and Adolescents*, Pediatr. Rev. (Jan. 1, 2023).

important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors and young adults, and particularly neurodivergent minors and young adults, whose brains are still developing. Increase frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

29.    The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway propelling the user to hyperfocus on using video games more and more, first at an increasing grate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

30.    Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors  causing a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's front lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, and other harmful effects, all to the severe detriment and damage to the player, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.

31.    Additional video game research reports the physical damage to the brain and brain matter as a result of gameplay.

32.     Research has shown prolonged use of video games damages the prefrontal cortex of the use, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has also concluded such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

33.     Clinical evidence has shown users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, ability to adapt, withdrawal, conflict, and recurrence symptoms.

34.     Empirical studies indicate gaming disorders are associated with detrimental health-related outcomes. Brain imaging studies have shown that excessive use of video games negatively affects the brain regions response for reward, impulse control, and sensory-motor coordination.

35.     Other studies have shown disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

36.     The prefrontal cortex – the locus of judgement, decision-making, and impulse control - is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature front lobes, minors and young adults

are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

37.    Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting most of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies showed several regions of the brain demonstrated reduction in grey matter volume in gaming disorder participants, as depicted here:[5]



38.    Brain activation studies have shown  the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extengish conditioned responses).

39.    Additional brain activation studies have shown individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-moto, and emotional processes may be associated with long-term changes to the brain because of the prolonged use of video games.

---

[5] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image: [6]



40.    Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible because of the changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

41.    Research has shown that players who have Attention Deficit Hyperactivity Disorder ("ADHD") and/or Autism Spectrum Disorder are at higher risk of developing video game addiction as these neurodevelopmental disorders can worsen one's ability to control impulsivity and result in brain damage.[7]

## II.    Gaming Addiction Is a Recognized and Diagnosable Condition

42.    Addiction to, and disorder use of, video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[8]

---

[6] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).
[7] Patrik Koncz, et al., *The emerging evidence on the association between symptoms of ADHD and gaming disorder: A systematic review and meta-analysis*, 106 Cl. Psy. Rev. (2023); Ecaterina Eltahir, et al., *Austim in relation to gaming disorder and internet addiction: A systematic review*, 162 Comp. in Human Behavior (2025).
[8] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or using video games is removed, precluded or reduced; (3) Tolerance – the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or other about the amount of spent playing or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationship due to playing and/or using video games.

43.    Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[9]

44.    As of 2022, "Gaming disorder" – disordered use of and/or play with video games – is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[10] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming"

---

[9] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[10] Other disorders found in that subcategory include alcoholism and gambling addiction.

or "video-gaming", which may be online or offline, manifested by: impaired control over gaming (e.g. onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

## III.    Historical Development and Modernization of Video Games

45.    The term "video game" is defined by California Civil Code §§ 1746-1746.5 as "any electronic amusement device that utilizes a computer, microprocessor, or similar electronic circuitry and its own monitor, or is designed to be used with a television set or a computer monitor, that interacts with the user of the device."

46.    Video games were first developed in or around the 1950s.

47.    Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

48.    By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

49.    Many video games – including Minecraft and Fortnite – can now be played on multiple different consoles, mobile devices, and tablets.

50.    Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, online gaming networks, and cloud gaming services.

51.    In 2024, there are 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[11]

52.    As sophistication of gaming devices and game delivery methods has increased, so too has the sophistication of the design of games themselves.

53.    Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become immersed in the world of the game.

54.    The ways in which game developers monetize their games have also changed over time. In the past, game developers earned revenue primarily through the one-time sale of their games. Although some game developers still follow this model, other – including Defendants – allow their games to be downloaded for no or minimal cost and generate revenue through purchases made within the game.

55.    In-game purchases can include, but are not limited to, "skins" which are cosmetic customizations for the player's character, "boosters" that help their character perform better or progress faster within the game, "loot boxes" which can be bought to provide a randomized item in game which may or may not benefit the player, and "season passes" that allow players to access exclusive in-game content.

56.    Many of these in-game purchases are relatively low cost, leading to them being termed "microtransactions".

---

[11] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

COMPLAINT FOR DAMANGES AND DEMAND FOR JURY TRIAL

57.     In-game items available for purchase are often heavily advertised to players through means such as in-game pop-up advertisements during gameplay, loading screens while users wait for gameplay to start, and in-game stores.

58.     Game developers that provide online or "live-service" versions of their base games – such as Minecraft and Fortnite – rely on these microtransactions to turn a profit. Indeed, the design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from the on-going microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars form an individual user.

59.     Accordingly, modern gaming companies enlist PhD behavioral psychologists and use techniques based on extensive research to implement programming into their games causing player addiction with a goal of increasing the amount of time spent in game, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

**IV. Psychological Techniques and Programming Choices Game Developers Use to Create Addiction, Drive Microtransactions, and Increase Profits.**

**A. Operant Conditioning**

60.     Modern game developers, including Defendants, employ(ed) and/or consult(ed) with child development experts and/or psychologists to assist with the design and development of their games and/or gaming platforms, and to analyze the effects of game design on user behavior.

61.     Upon information and belief, modern game developers, including Defendants, utilized child development experts and/or behavioral psychologists to design their games to attract and addict minors and young adults to their Products.

62.    Upon information and belief, the analyses performed by each Defendant's behavioral experts and/or psychologists revealed that when video games are programmed to incorporate "operant conditioning" targeting users' dopamine receptors, the operant conditioning triggers users' desire to hyperfocus on using and overusing the Products.

63.    "Operant conditioning" is a form of behavioral manipulation that uses rewards and punishments to influence behavior. Through operant conditioning, rewarded behavior is likely to occur more frequently, while the frequency of punished behavior decreases.

64.    In the context of video games and gaming platforms, video game developers including Defendants, relied upon these psychological analyses to program their games and platforms to employ operant conditioning to create and promote addicted players who can be manipulated into making  decisions profitable for the game developers, i.e., spend more time playing their respective games and, more importantly for Defendants, to execute as many microtransactions as possible.

**B. Development and Use of Patented Programming**

65.    In addition to relying on their own studies to make programming decisions, game developers, including Defendants, help develop, licensed, and otherwise utilized patented programming algorithms in their games and gaming platforms intended to addict players, increase time spent in-game, and drive microtransactions. By way of example:

    a. U.S. Patent No. 20160005270-A1, is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in Products, like Defendants' at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a

"microtransaction arrange match" to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions is comprised of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in-game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

b.   U.S. Patent No. 9623335-B1 utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game," such as a virtual shop "present[ing] high-end, or expensive virtual items." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

c. U.S. Patent No. 9138639-B1 creates a dynamic pricing system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

d. U.S. Patent No. 9795886-B1 allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

e. U.S. Patent No. 9403093-B2 is a "dynamic" pricing patent that encourages users to make purchases on multiple game devices or platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating to play the game."

f. U.S. Patent No. 9626475-B1 creates an exclusive, time-limited, event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

g. U.S. Patent No. 9666026-B1 provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual

items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the first offer."

h. U.S. Patent No. 9808708-B1 adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

66.    Upon information and belief, many game developers, including Defendant, license one or more of the above technology patents, and/or other patents similar thereto, and incorporate said technology into their respective Products with the intention of creating addiction and profits.

**C. Operant Conditioning, Patented Technology, and Game Design Choices Increase Time Spent In-Game and Revenue Generated by Microtransactions**.

67.    Using operant conditioning and patented technology, video game developers, including Defendants, analyze the skill level and behavior of the user and customize their experience to maximize the time spent in-game, during which the user is bombarded with solicitations to purchase additional in-game downloadable game content.

68.    In doing so, video game developers, including Defendants, exploit an information asymmetry between themselves and the user, allowing game developers, including Defendants, to use their knowledge of the user's skill, game-related preferences, available funds, and/or playing and spending habits, to present in-game downloads and user-specific purchase offers to maximize the expenditure of real money.

69.    For example, in some instances, video game developers, including Defendants, increase the difficulty of the game as the player's skill increases, thereby increasing the amount of

time it takes for the player to achieve repeated success. During the extra time it now takes for the player to achieve success, the player is exposed to repetitive advertisements for desirable in-game items that can be obtained through points earned over time through continued and prolonged gameplay or instantaneously using in-game or real-world currency.

70.     Likewise, game developers, including Defendants, may offer "season passes" in which players can pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during gameplay. Game developers incentivize players who purchased "season passes" to engage in prolonged game sessions during the "season" to earn sufficient points to collect each exclusive item. However, by design, game difficulty is dynamic, resulting in players needing to play longer to obtain the results they desire, all while being exposed to advertisements for additional in-game products.

71.     Critical to each Defendant's revenue, such continued schemes with little to no restriction on the amount of money spent in the payment interface also makes it easy for minor users to fail to understand the value of the actual money spent which allows for more easeful and continuous spending of real money.

72.     These and other schemes – all of which the Defendants knowingly incorporate into the design features of their respective Products – use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially minors and young adults wo are vulnerable to these tactics and which serve to deepen their disordered or addicted use.

## V. Addictive Game Design Features Cause Significant Harm to Minors

73.     The human population most vulnerable to the combination of game developers' microtransaction methodology and addictive operant conditioning design features are minors and

young adults; neurodivergent players are even more susceptible to becoming addicted. Video game developers, including Defendants, knew this, but nonetheless purposefully designed their games to exploit that vulnerable population, causing injury and detriment, including to Plaintiff. Doing so has yielded the intended results: video game developers, including Defendants, have earned extraordinary financial revenue from this group of users as a result of placing their addictive Products into the stream of commerce.

74.     Each Defendant knew or was aware, or should have known and should have been aware, that their respective Products were dangerous and harmful to users when used as intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused and designed their respective Products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the Products. To that end, upon information and belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop Products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the Products for longer and longer periods of time.

75.     The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, programs, and other processes each Defendant incorporated into their Products were implemented in a manner such that users do not understand and have no way of understanding (or uncovering through reasonable diligence) their use of the Products involves engagement with intentionally addictive design features are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

76.     There is no meaningful disclosure of the addictive mechanisms and microtransactions in each Defendant's Products at the time they are purchased to allow prospective users to make

informed decisions as to whether using the Products are desirable, appropriate, safe, or worth the potential risk.

77.     At all times material hereto, each Defendant targeted consumers/purchasers and specifically including Plaintiff herein, to use their respective Products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

78.     Each Defendant targeted Plaintiff with manipulative programming to prolong use of their Products in hopes of Plaintiff to engage in microtransactions during their use of the Products. As a result of Plaintiff's use of each Defendant's Products, and because of the addictive design features incorporated into the Products, Plaintiff was injured and damaged as herein alleged.

**VII. Fortnite**

**A. Fortnite Gameplay Basics**

79.     Fortnite is an online video game and game platform designed, developed, and published by Epic Games.

80.     Fortnite is free to play, making it easily accessible to all players.

81.     Fortnite was first released in 2017 and is now available in three distinct game mode versions all sharing the same general design and engine.

82.     Fortnite: Battle Royale is a "free-to-play" battle royale game in which up to 100 players fight in a progressively shrinking area to be the last person standing. Players can play alone, in a due, or in a "squad" of 3-4 players. When users are "dropped into" the game arena, the player must scavenge for weapons, items, resources, and vehicles while trying to stay alive,

attack, and eliminate other users. Battel Royale is frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.

83.    The other two modes for Fortnite are Fortnite: Save the World and Fortnite Creative. Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four players fight off zombie-like creatures and defend objects with traps and fortifications they can build. Players are awarded a number of in-game items from and during missions, including hero characters, weapons and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play mode of the Fortnite franchise. Fortnite Creative is a sandbox game mode in which players are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

84.    Each of Epic Games's herein listed Fortnite Products has similar graphics, art assets, and game mechanics.

85.    Fortnite game Products are monetized using V-Bucks: in-game, virtual, currency purchased with real-world funds or earned through completing missions and other achievements in Save the World.

86.    Fortnite includes a feature called a "Battle Pass", which is the same feature as a "season pass" described above. Compl. ¶ 70. The Battle Pass in Fortnite allows players to earn various rewards by "leveling up" the Pass. Levelling up can be done by earning medals during gameplay, completing challenges, and purchasing the levels with V-Bucks.[12] The purpose of the

---

[12] *What is the Battle Pass? Where Can I Learn More?*, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-thebattle-pass-where-can-i-learn-more-a000084706 (last visited Jan 9, 2026).

Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase profits for Epic games through the purchase of in-game content.

**C. Fortnite was Designed with Intentionally Addictive Features**

87.    Epic Games knows that players who are susceptible to addiction are using their Products but nonetheless chose to add features to its Products to intentionally addict such users.

88.    Epic Games designed Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a player's brain and to create addictive engagement, while knowing that abuse, addiction, and compulsive use can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

89.    Epic Games actively employs or has employed psychologists and behavioral scientists within its User Experiences department and Online department.[13]

90.    Upon information or belief, Epic Games designed Fortnite in conjunction with psychologists and other behavioral experts to ensure the addiction of players.

91.    For example, Epic Games designed an achievement system within Fortnite that rewards users for completing various tasks or actions. For example, a player playing Fortnite can unlock an achievement for saving 1,000 survivors in successful missions or completing 1,000 missions. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. Many achievements are difficult to obtain and require hundreds

---

[13] *See, e.g.*, Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited Jan. 9 2026); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited Jan. 9 2026); *Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic Games), NC State University Libraries*, https://www.lib.ncsu.edu/events/video-games-psychologyand-user-experience-dr-celia-hodent-epicgames#:~: text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20N C%20State%20University%20Libraries (Feb. 2, 2016); Katelyn Procci, LINKEDIN, https://www.linkedin.com/in/katelynprocci (last visited Jan. 9, 2026).

of hours of gameplay to unlock. This system is designed to keep users engaged with the game, incentivize long periods of gaming over many days, and ultimately increase Epic Games' profits.

92.    Likewise, as noted above, Epic Games designed a Battle Pass system allowing players to earn various time-limited in-game and cosmetics by obtaining points through the completion of increasingly difficult challenges across repeated hours and sessions of gameplay or by spending real-world money through V-Bucks.

93.    The use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, and other features described herein are all examples of Epic Games employing these psychological tactics.

94.    Epic Games failed to disclose that it designed Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a user's brain and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users can lead to brain damage, abuse, compulsive use, addiction, and other injury.

95.    Epic Games knew that its Fortnite Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe.

96.    Epic Games misrepresented Fortnite as educational and safe while knowing that abuse, addiction, and compulsive use by players can lead to brain damage and injury and knowing that it had designed and developed Fortnite to be as addictive as possible. Many health experts have concluded that Fortnite is more addictive than heroin and other illegal drugs. [14]

---

[14] Rachel Ehmke, *A Parent's Guide to Dealing With Fortnite*, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Jan. 9, 2026).

97.     Epic Games did not inform and concealed from the public that Fortnite posed significant risks of harm to users due to Epic Games's decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use can lead to brain damage and injury.

98.     At account set up, Fortnite's website contains no warning labels, banners, or messaging informing players of the known risks and harms stemming from the excessive use of Epic Games's Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

99.     During gameplay there are no warning labels, banners, or messaging informing players of the known risks and harms stemming from the excessive use of Epic Games's Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

100.    Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the Product more and more.

101.    The Fortnite development team includes psychologists, statisticians, analysts, and coordinators who worked for years to develop a Product that was as addictive as possible.

102.    Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its Product. Instead Epic Games touts Fortnite as "educational" and markets it for use in the classroom.

103.    Epic Games does not adequately inform, or inform at all, players of the inherent risks involved with using Fortnite, specifically including that Fortnite was designed to addict users to their extreme harm and detriment.

**VII. Minecraft**

**A. Mojang and Microsoft Design, Develop, and Market Minecraft**

1.  Minecraft was first developed and released by Mojang in November 2011.

2.  In September 2014, Microsoft acquired Mojang and its intellectual property (including Minecraft).

3.  After its acquisition of Mojang, Microsoft has been directly and actively involved with Mojang in the design, development, testing, production, manufacture, labeling, marketing, advertising, promotion, supply, sale, and distribution of Minecraft. Indeed, since acquiring Mojang, Microsoft has overseen over 125 updates to Minecraft.

4.  To date, over 300 million copies of Minecraft have been sold,[15] and the game averages around 100 million players per month.[16]

**B. Minecraft Gameplay Basics**

5.  Minecraft is a 3D sandbox game that can be played on PC, gaming consoles, and mobile devices, making it an incredibly versatile and accessible game.

6.  Minecraft's visual design is simple, using blocky, pixelated graphics, and basic colors.

7.  The game itself is easy for users to learn and understand. Gameplay involves the user's character collecting resources, exploring the Minecraft world, crafting items, and trying to survive. The Minecraft world is virtually infinite and is generated based on the player's exploration.

8.  There are multiple game modes, including survival mode and creative mode. Players in survival mode must gather resources to build structures and maintain their health while

---

[15] Britney Nguyen, *Minecraft Just Surpassed 300 Million Sales–Here's The Only Video Game Still Beating It*, Forbes (Oct. 16, 2023), https://www.forbes.com/sites/britneynguyen/2023/10/16/minecraft-just-surpassed-300-millionsales-heres-the-only-video-game-still-beatingit/#:~:text=Minecraft%20 has%20reached%20over%20300,Minecraft%20Live%202023%20this%20weekend..
[16] Spencer Whitworth, *Minecraft Live Player Count (September 2024)*, Sportskeeda (Sept. 1, 2024), https://www.sportskeeda.com/minecraft/minecraft-live-player-count.

avoiding attacks from monsters known as "mobs". Players in creative mode have access to unlimited resources they can use to craft items or create structures. Within the creative game mode, the player cannot get hurt by attacking "mobs." Each game mode offers slightly different building abilities and access to resources.

9.      Minecraft users are encouraged to join different "worlds," which can include multiplayer or single-player world depending on what kind of world the player enters. To generate a world to play in, players utilize "seeds" which are essentially computer codes. Once a player enters a seed, the code creates a world for the user to explore. The seed shapes the landscape of the world.

10.      The exact structures of most worlds are unique to that world, but worlds created with the same seed will be identical. Players can share seeds with friends so the friends can create the same world using that seed.

11.      Mojang and Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world.

12.      There are different versions of Minecraft available for play depending on the platform used. The original version of Minecraft, not called "Minecraft Java", is available fro play on a PC. The most popular version of Minecraft is called "Minecraft Bedrock" and is available on most platforms. Minecraft Java and Minecraft Bedrock are similar; however, the Bedrock version is still currently updated and has additional features that Minecraft Java does not have.

13.      In order to play Minecraft, users must purchase the game and create a Minecraft account.

COMPLAINT FOR DAMANGES AND DEMAND FOR JURY TRIAL

14.    To create a Minecraft account, users must input a pre-existing Microsoft account, or create a Microsoft account, and choose a password. Users of any age can create a Minecraft account. There is no age verification upon sign-up on the Minecraft website.

15.    Minecraft has its own form of currency called "Minecoins." One Minecoin is worth less than one US dollar. Minecoins can only be purchased with real currency.

16.    Minecoins can be used to purchase various in-game features such as new skins for the user's avatar, "texture packs" that change the appearance of building blocks within the game, "mash-up packs" that allow users to enter themed worlds with special textures and skins, mini games, and access to new adventures via adventure maps.[17]

17.    In addition to the base game, users can purchase a "Marketplace Pass" for $3.99 per month. The Pass allows subscribers to "[p]lay 150+ pieces of exciting content…dive into worlds, mash-ups, skin packs, texture packs, and more." New content is added every month to the Pass.[18]

18.    Users can also purchase a "Realms Subscription" which allows them to run their own Minecraft server and share their Marketplace Pass items with up to 10 friends. A Realms Subscription starts at $3.99 per month.

19.    In 2024, Minecraft made Microsoft and Mojang approximately $220,000,000.00 in revenue.[19]

**D. Minecraft was Designed with Intentionally Addictive Features**

20.    Microsoft and Mojang know that there are players susceptible to addiction using their Product, but nonetheless chose to add features to Minecraft to intentionally addict said players.

---

[17] *Minecraft Marketplace*, Minecraft, https://www.minecraft.net/en-us/marketplace (last accessed Jan. 15, 2026)
[18] *Minecraft Marketplace Pass*, Minecraft, https://www.minecraft.net/enus/marketplace/marketplace-pass (last accessed Jan. 15, 2026).
[19] David Curry, *Minecraft Revenue and Usage Statistics (2024)*, Bus. of Apps (Jan. 10, 2024), https://www.businessofapps.com/data/minecraft-statistics/.

21.     Upon information and belief, Microsoft and Mojang actively employ or have employed psychologists and behavioral experts to work on Minecraft development.

22.     Microsoft and Mojang designed Minecraft with psychological tactics to take advantage of the chemical reward system of a player's brain and to create addictive engagement, while knowing that abuse, addiction, and compulsive use can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

23.     For example, Microsoft and Mojang created specific in-game reward system known as "advancements" or "achievements" in order to incentivize players to engage in repeated and prolonged session playing Minecraft.

24.     In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP", which are used like a currency to enhance the user's in-game equipment and reach new levels of the game.

25.     When a user obtains enough XP, they can "level up", meaning the user's character advances to a[20] higher level, becomes more powerful and gains access to new talents and equipment.

26.     In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. The achievement is then logged in the player's Minecraft account. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

27.     Not all advancements and achievements are equally easy to obtain. Instead, Microsoft and Mojang have intentionally created advancements and achievements that incentivize many

---

[20] *How to Earn Experience Points & Level Up in Minecraft*, (Jan. 24, 2022), https://www.dummies.com/article/home-auto-hobbies/games/online-games/minecraft/how-to-earnexperience-points-and-level-up-210066/.

hours and/or days of gameplay. By way of example, Microsoft and Mojang chose to reward players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. Theses achievements can take countless of hours across many days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

28.     This reward system creates addictive engagement and encourages players to continue gameplay.

29.     The use of rewards systems, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, and other features described herein are all examples of Microsoft and Mojang designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain to create addictive engagement, despite Microsoft and Mojang's knowledge that abuse, addiction, and compulsive use of its Product by foreseeable users can lead to brain damage, abuse, compulsive use, addiction and other injury.

30.     Microsoft and Mojang knew that its Minecraft Product contained an inherent risk of abuse, addiction, and compulsive use and the harms that arise therefrom, but instead of disclosing such harms Microsoft and Mojang marketed Minecraft as "educational" and safe for use.

31.     Microsoft and Mojang misrepresented Minecraft as education and safe for use while knowing that abuse, addiction, and compulsive use by players can lead to brain damage and injury and knowing that it had designed and developed Minecraft to be as addictive as possible.

32.     Microsoft and Mojang did not inform and concealed from the public that Minecraft poses significant risks of harm to users due to Microsoft and Mojang's decisions to design

COMPLAINT FOR DAMANGES AND DEMAND FOR JURY TRIAL

Minecraft to be as addictive as possible, while knowing that abuse, addiction, and compulsive use can lead to brain damage and injury in those individuals.

## VIII. Microsoft's Xbox and Xbox Products

### A. Xbox Product Basics

33.     Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

34.     Each version of the Xbox console provides users with the ability to play video games using a hard copy of the video game, a digital copy downloaded from the Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using Xbox Network (formerly known as Xbox Live), and/or using Xbox Game Pass or Cloud Gaming.

35.     Microsoft developed and maintains the Xbox Store – a product-platform through which users can purchase thousands of games to be stored on their console through digital download and for use with its Xbox consoles.

36.     Though third-party create the games available in the Xbox Store, Microsoft profits from all monetary transactions that occur within the store, taking thirty percent of revenue from sales of third-party console games.[21]

37.     Likewise, Microsoft profits from all monetary transactions that occur within the third-party games on its Xbox Platform.

---

[21] Tom Warren, *Microsoft Explored Reducing its Xbox Store Cut to Shake Up Console Gaming*, The Verge (Mar. 2, 2021), https://www.theverge.com/2021/5/2/22415712/microsoft-xbox-store-cut-epic-games-court-documents.

38.     The Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles. The Xbox Network includes the Xbox Store and Xbox Cloud Gaming.

39.     Xbox Cloud Gaming or Game Pass is operated by linking a device, either a console, tablet, phone, or computer, to a remote server in the cloud. Gameplay is saved in the cloud and can be accessed and used from numerous devices at any given location. Thousands of games are available in the Xbox Cloud Gaming and Xbox Network library, including Defendant's Products.

**B. Microsoft Employs a Game-Like Achievement System on Its Platforms that Causes and/or Exacerbates Compulsive Game Use.**

40.     Microsoft knows that third-party games targeted to vulnerable individuals are available on its Xbox Platform. Microsoft is therefore aware that minors and those who are susceptible to addiction are using its Xbox Platform. Nonetheless, Microsoft chose to add features to its Xbox Platform that intentionally addict such users.

41.     Microsoft actively employs or has employed psychologists and neuroscientists within its Xbox User Research and Xbox Player Experiences & Platform departments.[22]

42.     Upon information and belief, through the use of such psychologists and neuroscientists, Microsoft developed its Xbox achievement system to keep users compulsively and addictively engaged with its platform, despite its knowledge that abuse, addiction, and compulsive use can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

---

[22] *See Xbox Research*, Microsoft, https://www.microsoft.com/en-us/research/group/xbox-research/ (last accessed Jan. 16, 2026) ("Our team members have a diverse set of backgrounds including cognitive psychology, social psychology, interaction design, human factors, ethnography, and neuroscience.")

43.     For example, within its Xbox Products, Microsoft developed and implemented a program called the Xbox achievement system ("Xbox achievements" or "achievements"). Xbox achievements is a game-like program that tracks the amount of time a player spends in third-party games on the Xbox platform and the player's actions within those games.

44.     Microsoft encourages game developers to use its achievement system by creating tasks for players to accomplish within their respective games.

45.     Microsoft makes available to all users the achievements that are available within the games they are playing.

46.     Many of the achievements created within Microsoft's achievement system are met by players spending excessive time in-game. For example, a player can earn the Minecraft "Passing the Time" achievement by playing Minecraft on Xbox for 100 days. Likewise, Roblox achievements include "Marathon" for playing Roblox for an hour, "3 Day Roll" for playing Roblox three days in a row, "10 Day Roll" for playing Roblox ten days in a row, and "20 Day Roll" for playing Roblox 20 days in a row. Similarly, Fortnite includes the "Talented Builder" achievement for building 500,000 structures within the game.

47.     Within each user's Xbox profile, an "achievements" tab displays each game where the user has obtained an achievement. Within the achievements tab, each game shows the percentage of other players who have unlocked the same achievement, and the date it was unlocked.

48.     If a user has the Xbox Platform on, but fails to engage with it for a length of time, Microsoft displays a screensaver that highlights a user's progress in unlocking achievements within a third-party's game.

49.     When these achievements are earned, *Microsoft* – not the third-party game – notifies the player with a console based – not game based – message. This console based message is akin

to the lights sounds of a slot machine in a casino. Microsoft plays a reward-signifying noise and displays a bright message on the screen highlighting the player's accomplishment.

50.    Xbox achievements are categorized as either standard achievements or rare achievements. When a rare achievement is unlocked, the graphic displayed on the user's screen in-game indicates the achievement is rare. A rare achievement is one that less than 10% of users have unlocked.

51.    In addition to such messages, Microsoft awards players a "Gamerscore" for each achievement earned. In game-like fashion, Microsoft tabulates each player's Gamerscore for the achievements earned across all games played on the Xbox platform and displays that score for all other users to see.

52.    While Xbox achievements earned and a player's Gamerscore can be an indication to other users and friends about how much and how well a user has played, Microsoft's purpose for implementing Xbox achievements goes beyond the social aspects of gaming. Rather, Microsoft created the Xbox achievement system in order to incentivize extended and continued gameplay on its platform, resulting in more purchases in-game or of third-party games, al of which increase Microsoft's profits.

53.    Microsoft's Platform does not contain any warnings about the general harmful nature of its achievement system or general gaming addiction. At account setup, the Xbox website contains no warning labels, banners or messaging information users of the known risks and harms stemming from the use of the Xbox platform. Users are not provided with information regarding potential physical and mental harm associated with use of the platform, including stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders at account setup or at any time during

usage. Users are not provided with information regarding potential physical and mental harm associated with use of the Xbox Platform.

54.     Microsoft could, but chooses not to, provide warnings about the potential harms caused by use of the Xbox Platform without making any changes to the achievement system or the content of the achievements.

55.     Microsoft could, but chooses not to, implement user protections or safeguards, such as user-imposed time limits on gameplay, increased age verification at account setup, and automatic parental controls imposed when a minor creates an Xbox account.

## PLAINTIFF-SPECIFIC ALLEGATIONS

56.     Plaintiff's usage of Defendants' Products is compulsive and disordered, and he is incapable of restraining his usage. Any attempt to remove Plaintiff from his games is met with severe withdrawal symptoms including anger, destruction of property, compulsive and antisocial behavior, and inability to maintain sleep. Plaintiff's gaming addiction has had an ongoing and significant impact on his life and well-being.

57.     Plaintiff has been injured and harmed as a direct and proximate result of each Defendant's action and misconduct, and for that he is entitled to compensation and other damages under California law.

58.     Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior damaging and continuing to harm Plaintiff and countless others. For this, they should be punished, and punitive damages should be assessed against each Defendant for the respective misdeeds and unlawful conduct.

59.     Plaintiff never consented to be harmed or exposed to an addictive Product. Plaintiff never entered into a valid contract with any of the Defendants, and/or to the extent  any

Defendant claims Plaintiff attempted to accept an electronic terms and conditions clause by clicking buttons on a screen which included language Plaintiff did not understand, read, or which was conscionable, it has been made void by virtue of its unconscionability. The unconscionability is demonstrated and secured by the filing of this Complaint.

60.     Specifically, to the extent that any Defendant claims Plaintiff entered into a contract, any terms to which Plaintiff agreed are void and unenforceable. Each Defendant's terms of service or terms and conditions clauses are contracts of adhesion and have no variation or negotiable terms prior to the signing of parties.

61.     Plaintiff's continued use of Defendants' Products, to the extent such use exists is compulsive and due to Plaintiff's addiction to using the Products. Plaintiff's continued use does not serve as an affirmation of any potential contract between the Parties.

## PLAINTIFF'S CLAIMS

## COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Against All Defendants)

62.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as set forth fully here.

63.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

64.    The video game Products that each Defendant placed into the stream of commerce were defectively designed. The Products were designed to cause addictive and compulsive use. The Products were not reasonably fit, suitable, or safe for their intended purpose.

65.    The defective conditions of Minecraft, Fortnite, and Xbox platforms rendered them unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with Defendants' designs.

66.    The defects in each Defendant's respective designs were present in the Products when the Products left the hands of the Defendants and when they were released to the general public to be used in an intended and foreseeable manner.

67.    Minecraft, Fortnite, and the Xbox platforms, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking proper age verification, and each Product failing to operate as a reasonable user would expect.

68.    Each Defendant designed its Products to be addictive and to take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

69.    Each Defendant's respective Products were expected to and did reach Plaintiff without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

70.    Plaintiff used Defendants' Product – Minecraft, Fortnite, and the Xbox platforms – in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use.

71.    Each Defendant's respective Products were the direct and proximate cause of Plaintiff's injuries and harm that include, but are not limited to, emotional distress, diminished social interactions, lack of interest in other hobbies, withdrawal symptoms such as rage, anger, and physical outbursts.

72.    Plaintiff used Defendants' Products in their intended and reasonably foreseeable manner.

73.    Each Defendant knew or, by the exercise of reasonable care, should have known that players would use the Products without anyone inspecting the Products for addictive or other dangerous features.

74.    Reasonable users of Defendants' Products would not expect, and Plaintiff herein did not expect, that said Products would pose risks of severe physical and mental harm.

75.    Reasonable users of Defendants' Products would not expect that Defendants knew about risks of severe physical and mental harm and nevertheless chose to place their Products into the stream of commerce.

76.    Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing their respective Products without the harm-causing features listed above, while still providing an optimal gaming experience.

77.    At the time each Defendant's Products were designed, developed, distributed to Plaintiff and played, safer alternative designs existed that were entirely feasible.

78.    Each Defendant could have utilized cost effective, reasonably feasible designs to minimize harm caused by their respective Products by implementing elements that include, but are not limited:

a.    Robust age verification;

    b.   Effective parental controls;

    c.   The removal of barriers to the enactment of parental controls;

    d.   Warnings of health effects of use and extended use upon account setup;

    e.   Opt-in restrictions to the length and frequency of sessions;

    f.   Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

    g.   Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

    h.   Limits for microtransactions; and,

    i.   Others as set forth herein.

79.    Instead, each Defendant designed their respective Products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

80.    Plaintiff's injuries – physical, emotional, and economic – were reasonably foreseebale to Defendants at the time of the Products' design, marketing, and operation.

81.    Plaintiff was injured as a direct and proximate result of each Defendant's placement in their respective Products into the stream commerce, Plaintiff's use of the games as intended and designed, and the Products' defective design described herein.

82.    As a direct and proximate result of each Defendant's defective products, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require medical care and treatment in the future.

83.    Each Defendant's actions and omissions as alleged in this Complaint were intentional oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT II – STRICT PRODUCT LIABILITY – FAILURE TO WARN

### (Against All Defendants)

84.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as set forth fully here.

85.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

86.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of the Products. Minecraft, Fortnite, and the Xbox platform are highly addictive and likely to cause mental and physical injuries as listed above.

87.    Defendants knew, or should have known, that the use of Minecraft, Fortnite, and the Xbox platform was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

88.    Defendants knew that their Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, and that such use could result in severe physical, mental, and emotional injuries.

89.     Defendant owed a duty to warn consumers of the foreseeable risks and dangers of the Products the Defendants knew were present but not obvious or known to users or any average member of the consuming public.

90.     Upon information and belief, Defendants failed to include any warning or instructions regarding the herein identified risks and dangers of using Defendants' Products in their intended and foreseeable manner.

91.     None of Defendant's respective Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk harm and addiction to users.

92.     Defendants' Products did not contain a warning when the Products left their possession.

93.     Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

a.  Failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

b.  Failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

c.  Failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors, particularly in minors and neurodivergent players;

d. Failed to issue warnings to consumers regarding the dangerous risks of the Products even after the sale and/or download of their Products; and

e. Representing the Product was and is safe for use, when in fact, defendant knew or should have known that its Product was designed to cause minors to engage in excessive use until they developed an addiction or disordered compulsion to use the Product.

94. Moreover, each Defendant breached its respective duty of care owed to Plaintiff through their non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products. Those breaches include but are not limited to:

a. Designing the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third-parties;

b. Failing to implement effective parental controls;

c. Failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequence or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction compulsive use, or overuse; and

d. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending on in-game downloadable Products and upgrade and in-game purchases and/or microtransactions.

95. The failure of each Defendant to adequately warn about their defective Products created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Products.

96.     A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff of the dangers.

97.     Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have purchased or continue to use Defendant's respective Product. Likewise, Plaintiff would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Products in order to eliminate or mitigate the risk of harm.

98.     As a direct and proximate result of each Defendant's defective products and failure to warn about said Products, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

99.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT III – NEGLIGENCE – DESIGN

### (Against All Defendants)

100.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as set forth fully here.

101.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

102.    Defendants knew, or should have known, the use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

103.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Minecraft, Fortnite, and the Xbox platform. By design, these Products are highly addictive and likely to cause mental and physical injuries as listed above.

104.    Each Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

105.    Minecraft, Fortnite, and the Xbox platform as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in this Complaint, including, but not limited to, the use of operant conditioning in game design, the use of microtransactions in game design, the creation of Products without safeguards such as time restrictions on gameplay, the creation of Products without proper age verification, and because the Products created failed to operate as a reasonable user would expect.

106.    Defendants breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their Products less addictive and harmful, including but not limited to:

a.    Robust age verification;

b.    Effective parental controls;

c.    The removal of barriers to the enactment of parental controls;

d.  Warnings of health effects of use and extended use upon account setup;

e.  Opt-in restrictions to the length and frequency of sessions;

f.  Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

g.  Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

h.  Limits for microtransactions; and,

i.  Others as set forth herein.

107.    Each Defendant breached their duty by failing to use cost effective, reasonably feasible alternative designs to reduce mental and physical harm to users, especially youth. Instead, Defendants designed Products aggressively and relentlessly addict users with features promoting addictiveness, use time, frequency of use, and engagement with the Products.

108.    A reasonable company under the same or similar circumstances would have designed a safer product.

109.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

110.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

<u>**COUNT IV – NEGLIGENCE – FAILURE TO WARN**</u>

**(Against All Defendants)**

111.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as set forth fully here.

112.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

113.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of the Products. Minecraft, Fortnite, and Xbox platform are highly addictive and likely to cause mental and physical injuries as listed above.

114.    None of Defendants' Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users. Defendants' Products did not contain a warning of these risks when the Products left their possession.

115.    Had Plaintiff been aware the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have purchased, used, or continue to use Defendant's respective Product. Likewise, Plaintiff would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Product to eliminate or mitigate the risk of harm.

116.     Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

117.     Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical and mental injuries.

118.     A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

119.     As a direct and proximate result of each Defendant's breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

120.     As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

121.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT V – NEGLIGENCE – ORDINARY

### (Against All Defendants)

122.     Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

123.    Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including Plaintiff.

124.    Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the Products into the stream of commerce.

125.    Defendants also owed a duty to warn users of the hazards of using their Products, which Defendants knew were present in their Products, though such hazards were not obvious to users.

126.    Defendants' duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

127.    Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative designs.

128.    For their own profit, each Defendant chose not to engage in the development of a safer alternative designs.

129.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

130.    Defendants' failure to act in developing a safer alternative designs constitutes a breach of their duty of reasonable care.

131.    Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that users are developing disordered and addicted use.

132.    Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, about how and when, if ever, to safely use their Products.

133.    Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, the tools to ensure that their Products are used in a limited and safe manner.

134.    As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' respective Products.

135.    Each Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

136.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

137.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT VI – STATUTORY NEGLIGENCE**

**(Cal. Civ. Code § 1714)**

**(Against All Defendants)**

138.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

139.    Defendants had a duty to exercise ordinary care and caution for the safety of individuals using their Products.

140.    Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaged in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

141.    Defendants owed a duty to avoid engaging in conduct they knew, or reasonably should have known, would cause injury to their users, including Plaintiff.

142.    Defendants breached those duties.

143.    Defendants each negligently, recklessly, and/or carelessly created a harmful and addictive Product and failed to engage in the development of a safer alternative design.

144.    Defendants knew, or should have known, their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that users are developing disordered and addicted use.

145.    Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors about how and when, if ever, to safely use their Products.

146.    Defendants were and are negligent in failing to adequately provide users, and their caregivers in the case of users who are minors, the tools to ensure that their Products are used in a limited and safe manner.

147.    As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' respective Products.

148.    Each Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

149.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

150.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages, Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VII – INTENTIONAL MISREPRESENTATION

### (Cal. Civ. Code §1710(1))

### (Against All Defendants)

151.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

152.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

153.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

154.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

155.    Defendants Microsoft and Mojang designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing abuse and compulsive use can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

156.    Defendant Microsoft intentionally designed the Xbox Platform with addictive psychological features to keep users playing more often and for longer periods of time so the users spend more money on in-game and third-party purchases, while knowing that abuse and compulsive use can lead to injury, but concealed this information from the public.

157.    Defendants knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

158.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

159.    Defendants knowingly and intentionally misrepresented that their Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff.

160.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

161.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone."

162.    Defendant Microsoft stated that "Xbox strives to a safer gaming experience for you and your family," and that its Xbox store is "safer for the whole family" to use.

163.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

164.    However, each Defendant had no reasonable grounds to believe their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

165.    Defendants failed to disclose to users, including Plaintiff, that their Products are designed to create and sustain addiction.

166.    Defendants intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

167.    Defendants intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

168.    Defendants affirmatively represented their Products were safe for use while they simultaneously knew their Products caused addiction and compulsive use.

169.    Defendants intended for users, including Plaintiff, to rely on their representations that their Products were safe for use to keep users engaging with their Products and increase their profits.

170.    Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have purchased or used or continue to use Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

171.    Plaintiff was unaware of the dangerous and addictive nature of Defendant's Products. Plaintiff reasonably relied on Defendant's representations its Products were safe for use.

172.    Plaintiff reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

173.    A reasonable person, including Plaintiff, would find information impacting the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – material when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

174.    Because of Plaintiff's reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

175.    As direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered significant injury, harm, damages, and economic loss, and will

continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

176.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT VIII – NEGLIGENT MISREPRESENTATION**

**(Cal. Civ. Code §1710(2))**

**(Against All Defendants)**

177.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

178.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

179.    As detailed herein, Defendants knew about the defective conditions of their respective Products and the Products posed serious health risks to users.

180.    Defendant Epic Games knowingly concealed the fact Fortnite was designed with addictive psychological features to keep users playing more often and for longer periods of time, and that while knowing that abuse and compulsive use by youth can lead to injury they concealed that information from the public and Product users.

181.    Defendants Microsoft and Mojang designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing abuse and compulsive use can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

182.    Defendant Microsoft intentionally designed the Xbox Platform with addictive psychological features to keep users playing more often and for longer periods of time so the users spend more money on in-game and third-party purchases, while knowing that abuse and compulsive use can lead to injury, but concealed this information from the public.

183.    Defendants knew of the risks associated with the use of their Products based on internal research and external studies known within the industry. Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

184.    Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products.

185.    Defendant Epic Games stated it wants its product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

186.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone."

187.    Defendant Microsoft stated that "Xbox strives to a safer gaming experience for you and your family," and that its Xbox store is "safer for the whole family" to use.

188.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products for that reason.

189.    However, each Defendant had no reasonable grounds to believe their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant made false statements about the safety of their respective Products.

190.    Defendants failed to disclose to users, including Plaintiff, their Products are designed to create and sustain addiction.

191.    Defendants failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

192.    Defendants failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

193.    Defendants affirmatively represented their Products were safe for use while they simultaneously knew, or reasonably should have known, their Products caused addiction and compulsive use.

194.    Defendants intended for users, including Plaintiff, to rely on their representations their Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products for that reason.

195.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have

purchased, used, or continue to use Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

196.    Plaintiff was unaware of the dangerous and addictive nature of Defendant's Products. Plaintiff reasonably relied on Defendant's representations that its Products were safe for use.

197.    Plaintiff reasonably relied on Defendants' material representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

198.    A reasonable person, including Plaintiff, would find information impacting the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – material when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

199.    Because Plaintiff reasonably relied on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

200.    Defendants' misrepresentations were a substantial factor in causing harm to Plaintiff, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

### COUNT IX – FRAUD

### (Against All Defendants)

201.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

202.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

203.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the Products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

204.    Each Defendant knew their Products posed risks to players, like Plaintiff, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like Plaintiff, to purchase/download the game and to continue using Defendants' Products and encourage the addiction knowingly caused by Defendants' Products.

205.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users.

206.    Defendants Microsoft and Mojang designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing abuse and compulsive use can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

207.    Defendant Microsoft intentionally designed the Xbox Platform with addictive psychological features to keep users playing more often and for longer periods of time so the

users spend more money on in-game and third-party purchases, while knowing that abuse and compulsive use can lead to injury, but concealed this information from the public.

208.    Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the Products posed serious health risks to users, particularly youth.

209.    No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

210.    Defendants knowingly and intentionally misrepresented that their Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff.

211.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits.

212.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

213.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

COMPLAINT FOR DAMANGES AND DEMAND FOR JURY TRIAL

214.    As a direct and proximate result of each Defendant's material omissions, Plaintiff had no reason to believe that each of Defendant's Products were unsafe to use.

215.    Plaintiff reasonably relied on each Defendant's misrepresentations that each of their Products was safe for use.

216.    A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

217.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

218.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT X – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Cal. Civ. Code §§ 17200 *et seq.*)

### (Against All Defendants)

219.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

220.    Defendants are corporations, and thus each of them is a "person," as defined by California Business & Professions Code § 17201.

221.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, et seq., prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising."

222.    By the conduct described in detail above and incorporated herein, each Defendant engaged in unfair and deceptive acts in violation of California's Unfair Competition Law.

223.    Each Defendant knowingly engaged in the production, design, distribution, and sale of the Products to users, including Plaintiff, that were unsafe and addictive, particularly for minors.

224.    Each Defendant promoted their Products to users, especially minor users, while concealing harmful information about the addictive and unsafe nature of said Products.

225.    These business practices that Defendants have engaged in are fraudulent and deceptive practices in violation of the UCL.

226.    Defendants' business practices are also unfair in violation of the UCL. Each Defendant's actions are unethical at minimum, and the benefit of employing their deceptive and addictive features does not, in any circumstance, outweigh the harm that Plaintiff suffered.

227.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described herein.

228.    As a direct and proximate result of each Defendant's conduct, Plaintiff sustained economic losses, including hundreds of dollars per year in video game related spending. Had Defendants not engaged in these fraudulent and deceptive practices, Plaintiff would not have sustained the aforementioned economic injuries.

229.    As a result of each Defendant's conduct, Plaintiff sustained significant injuries.

230.    As such, in accordance with the provisions of the California Business and Professions Code §§ 17200 and 17203, Plaintiff requests that this Court enjoin each Defendant from continuing to violate the UCL or violating it in the same fashion in the future, and from continuing to conduct business via the unfair and fraudulent business acts as set forth in this Complaint.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against each Defendant as to each relevant cause of action as follows:

1. For Plaintiff's general damages, including pain and suffering and emotional distress, according to proof at the time of trial;

2. For Plaintiff's past and future economic and special damages according to proof at the time of trial;

3. For Plaintiff's medical and related expenses according to proof at the time of trial;

4. For Plaintiff's prejudgment interest according to proof, pursuant to California Civil Code § 3291 at the time of trial;

5. For Plaintiff's costs of suit herein;

6. For Injunctive relief;

7. For Attorneys' fees;

8. For exemplary and/or punitive damages according to proof at the time of trial; and,

9. For such other and further relief, whether at law or in equity, that this Court deems just and proper.

Dated:  January 21, 2026

/s/ C. Moze Cowper
C. Moze Cowper
**COWPER LAW LLP**
12301 Wilshire Blvd. Suite 303
Los Angeles, California 90025

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of any and all issues in this action so triable.

Dated:  January 21, 2026

/s/ C. Moze Cowper
C. Moze Cowper
**COWPER LAW LLP**
12301 Wilshire Blvd. Suite 303
Los Angeles, California 90025